***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Kim Ledford, as well as the briefs and oral arguments of both parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission affirms and adopts the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, which has jurisdiction of the parties and of the subject matter.
2. On or about January 29, 2002, the defendant-employer employed more than three employees and the employer and its employees were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
3. On or about January 29, 2002, there existed between Sheila K. Sweet and MBM Corporation an employee-employer relationship.
4. On or about January 29, 2002, the employer was self-insured for workers' compensation claims.
5. On or about January 29, 2002, the plaintiff was employed by the employer-defendant at an average weekly wage to be determined by a Form 22, to be submitted via stipulation of the parties or from other wage information provided by the respective parties. By cover letter of September 3, 2003, defense counsel submitted a Form 22, which was received by the Commission on that same date.
6. On or about January 29, 2002, plaintiff alleges that she sustained a specific traumatic incident arising out of and in the course of her employment with defendant-employer, with said accident resulting in an injury to her lower back, neck, shoulders, arms, left knee and right hand.
7. The parties stipulated that the following medical records are authentic and may be received as evidence, as they are maintained in the course of the activity of the physicians or institutions identified:
a. J. Greg Nelson, M.D., Rocky Mount Orthopedics and Sports Medicine, Rocky Mount, NC, 2 pages of records dated February 28, 2002;
b. David Miller, M.D., Carolina Regional Orthopedics, Rocky Mount, NC, 16 pages of records dated March 21, 2002 through September 3, 2002;
c. Nash Urgent Care, Rocky Mount, NC, 14 pages of records dated February 3, 2002 through February 27, 2002;
d. Nash Day Hospital, Rocky Mount, NC, 16 pages of records dated February 28, 2002 through May 1, 2002.
8. The plaintiff received benefits under a short-term disability plan, which was fully funded by the employer at the rate of $289 per week (which is represented to be 60% of her gross pay) from March 5, 2002 through September 4, 2002. The defendants are seeking a credit for such payment against any compensation for wage loss, which may be awarded to plaintiff.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff was born on April 28, 1965. She graduated from high school and received training in cosmetology, receiving her cosmetology license in 1988.
2. Plaintiff was hired by defendant MBM Corporation in June 2000 to be an auditor at a wage of $12.50 per hour. The auditors used scan guns to scan items and make sure the correct items were in stock. MBM is a food distribution company. Plaintiff worked as an auditor for about one year (until June 2001).
3. Around July 2001, plaintiff transferred departments and was assigned to be a small wares and chemicals selector. In this new job, plaintiff would essentially select items for various trucking routes, including small wares (such as condiments, cooking utensils, meat thermometers) as well as chemicals used in the food service industry. In this department, she lifted a lot of heavy boxes, to sort them and place them on pallets. The boxes containing chemicals such as Clorox were among the heaviest. Plaintiff described the "Empire box" as being one of the heaviest of the boxes, weighing around 45 to 50 pounds, though she was not sure what these boxes contained.
4. On or about January 29, 2002, plaintiff picked up an Empire box and felt a burning sensation and subsequent pain in her lower back. She dropped the box, and then went to locate her supervisor, Tim McDaniel. She told Mr. McDaniel about dropping the box and her back pain and asked to be relieved. Tim McDaniel reported this to Jim Hall and a report of accident form was completed. They asked plaintiff if she could complete her shift because they were short-staffed. She took some Advil and finished her shift, although she was in pain.
5. Tim McDaniel testified at the hearing. He confirmed that plaintiff told him she had hurt her back pulling products. Plaintiff also told Mark Tan, her brother-in-law, who was also at work for the employer that day, that she had hurt her back. Mr. Tan confirms that the Empire box weighs 45 to 50 pounds. He recalls it was around 5:30 to 6:30 p.m. when plaintiff told him she had hurt her back. Finally, plaintiff told Kendrick Everette, who was a supervisor at the time, that she had hurt her back lifting a box. Tim McDaniel and Mark Tan were in also Mr. Everette's office at the time, and heard what was said.
6. Before going to work the next day, plaintiff soaked in her Jacuzzi tub in an effort to ease her back pain. When she reported to work, she talked with Tim McDaniel about her back pain and he said he would work with her as long as they could get the routes off on time. Plaintiff was off work the next three days.
7. On February 3, 2002, plaintiff sought medical treatment for her back pain at Nash Urgent Care. Plaintiff was assessed with muscle strain and told to take Ibuprofen and Skelaxin. She was given a restriction of no lifting more than 15 pounds.
8. Although the records of Nash Urgent Care indicate that plaintiff reported that she had experienced back pain on and off for about three months, these do not negate the incident she described on January 29, when plaintiff experienced an acute onset of back pain as she was lifting the Empire box. Three other employees who were present on that date, including her supervisors, confirm that plaintiff told them she had hurt her back lifting the box, and the same is credible testimony.
9. On February 12, 2002 plaintiff returned to Nash Urgent Care, at which time she reported that her muscle spasms had improved, but still bothered her while stooping. She was advised to take Ibuprofen as needed and to continue on light duty for the next seven days.
10. Plaintiff returned to Nash Urgent Care eight days later on February 20, with continued complaints of muscle pain. She was referred to an orthopaedic specialist, Dr. Greg Nelson of Rocky Mount Orthopaedics.
11. Plaintiff was seen by Dr. Nelson on February 28, 2002. At that visit, she complained of continuing neck and low back pain resulting from the repetitive lifting she did at MBM. Dr. Nelson assessed her with cervical neck strain and lumbar strain, and recommended physical therapy and that she continue with her work restrictions. He also noted his opinion that plaintiff could not tolerate doing a great deal of heavy lifting over the long term.
12. On March 8, 2002, plaintiff was evaluated for outpatient physical therapy at Nash Day Hospital. Plaintiff complained of bilateral (right greater than left) neck pain, which radiated down to her upper trapezius, with intermittent symptoms into her right arm with tingling and numbness in her hand. She also complained of bilateral low back pain, without radiation. She reported that her cervical symptoms were constant, made worse with movement out of the neutral position. Her lumbar symptoms were intermittent, and made worse with sitting and decreased with walking. The rehabilitation plan consisted of spinal ROM exercises, strengthening progression, therapeutic exercise, home exercise program, and pain relieving modalities prn.
13. On March 21, 2002, Plaintiff first visited Dr. David C. Miller of Carolina Regional Orthopaedics. She reported to Dr. Miller the incident when she was lifting the box and had on onset of lower back pain. Although she reported that physical therapy had helped, she complained of constant pain in her lower back and neck. She also described a numbness sensation in the right hand, with radiation into the forearm. Dr. Miller examined plaintiff and reviewed x-rays of the cervical spine taken by Dr. Nelson's office.
14. The x-rays showed a slightly straightened cervical lordotic curve, with disc space narrowing at C4-5, mild to moderate at C5-6, and no signs of fractures or dislocations. Lumbar films taken by Dr. Miller's office showed signs of spondylosis at L4-5, with no signs of fractures, tumors, or infection. Dr. Miller's impression was cervical strain with right hand symptoms possibly secondary to carpal tunnel syndrome, with signs of cervical spondylosis at C5-6 level. He also noted evidence of lumbosacral strain, which was most likely a facet joint injury. Dr. Miller continued plaintiff's physical therapy and gave her a trial of Sterapred DS Dosepak, followed by Celebrex.
15. Plaintiff returned to see Dr. Miller on April 23, 2002. An MRI scan of the neck showed right C5 neural canal stenosis secondary to spondylitic changes as well as intervertabral disc and right uncovertebral joint compression of the C6 nerve root. An EMG nerve conduction study was indicative of right carpal tunnel syndrome. She had normal range of motion in the cervical and shoulder area, while range of motion of the lumbar spine was approximately 75% of normal, with pain on extension and flexion of the back. Dr. Miller assessed resolving cervical and right arm pain, right carpal tunnel syndrome and mechanical low back pain. An epidural Cortisone injection was given, and plaintiff was to return in 3 weeks, after a lumbar MRI. Dr. Miller continued her on light duty with no lifting over 15-20 pounds, no repetitive bending at the waist, and limited standing and walking. He also suggested that she lose weight.
16. Plaintiff saw Dr. Miller again on May 21, 2002. The lumbar MRI showed mild to moderate spinal canal stenosis at L4-5 secondary to facet joint enlargement and mild stenosis at the L3-4 level. There was also facet joint hypertrophy at the L4-5 and L5-S1 levels bilaterally. Plaintiff reported that the Cortisone injection had given her some pain relief. Dr. Miller instructed her to remain on Vioxx, and to continue physical therapy and he again suggested that she lose weight.
17. Plaintiff's next visit to Dr. Miller's office was on August 6, 2002, when she complained of increased pain in the lower back. She was assessed by the physician's assistant, Guy A. Mazzone, who then reviewed the case with Dr. Miller. Plaintiff was advised that she should continue her light duty work, with the same restrictions. The notes state that she would not be a candidate for medium to heavy work.
18. Plaintiff returned to see Dr. Miller on September 3, 2002. At that time she reported mild pain, not sufficient to have another Cortisone injection. Dr. Miller also noted at that time plaintiff she was undergoing cardiac evaluation due to shortness of breath. Plaintiff was continued on light duty work.
19. Dr. Miller has stated his opinion the plaintiff's underlying back problems could have been aggravated by the specific incident at work on January 29, 2002, when she was lifting the heavy box. He anticipates that plaintiff will have a five percent permanent impairment to her spine and recommends that she pursue other employment options.
20. Plaintiff last worked for the employer MBM Corporation on March 3, 2002. She reported to work that day and was told by Mr. Hall not to work and was sent to the Human Resources office. At the HR office, plaintiff was told she could file for disability. Over the next 2 to 3 months, she inquired about work and was told that the employer had no light duty available for her.
21. Plaintiff presented herself as ready and willing to work for MBM Corporation, doing the light duty prescribed by Dr. Miller. Rather than provide accommodations within her restrictions, the employer chose to instruct her to file for disability benefits.
22. Since that time plaintiff has not returned to work for the employer or any other employer. Due to the aggravation of her pre-existing back condition, which resulted from the specific traumatic incident of January 29, 2002, she has been unable to return to her prior employment. Although plaintiff does not have an extensive injury, defendants presented no evidence that plaintiff was capable of earning wages in other employment, which was available and within plaintiff's restrictions.
23. The plaintiff received unemployment insurance at $289.00 per week for a period from September 5, 2002 through June 17, 2003.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On January 9, 2002, plaintiff sustained a specific traumatic incident arising out of and in the course of her employment with the Defendant MBM Corporation, as she was lifting a heavy "Empire" box, resulting in injury to her back. N.C. Gen. Stat. § 97-2(6). A specific traumatic event need not involve unusual conditions or a departure from the claimant's normal work routine. Lettley v. Trash Removal Serv.91 N.C. App. 625, 372 S.E.2d 116 (1988).
2. The specific traumatic incident provision of N.C. Gen. Stat. § 97-2(6) requires claimant to prove an injury at a judicially cognizable point in time. Ruffin v. Compass Group USA, 150 N.C. App. 480, 483,563 S.E.2d 633, 636 (2002) (citing, Fish v. Steelcase Inc.,116 N.C. App. 703, 708, 449 S.E.2d 233, 237). In determining whether an injury occurred at a cognizable time it is not necessary to allege the specific hour or day of injury. Instead, there must be a showing by claimant that enables the Industrial Commission to determine when, within a reasonable period, the specific injury occurred. Id. In this case, the evidence is sufficient to establish the date and approximate time of the plaintiff's specific traumatic injury.
3. As a consequence of the specific traumatic incident, plaintiff suffered an aggravation of her pre-existing back condition. N.C. Gen. Stat. § 97-2(6). Click v. Pilot Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980).
4. Defendants are responsible for payment of all medical expenses incurred by plaintiff for reasonably necessary medical treatment she has received as a result of the specific traumatic incident of January 29, 2002. N.C. Gen. Stat. 97-25.
5. As a consequence of her injury, plaintiff has been under work restrictions and has been unable to earn wages in the same or any other employment since her employer told her they had no light duty available, and she was placed on disability. Once plaintiff establishes that she has suffered a loss of wage earning capacity, a presumption of `ongoing' or `continuing' disability arises, and the burden shifts to the employer to show that the employee is capable of earning wages. Knight v. Wal-MartStores, Inc., 385 N.C. 749 (2002). Plaintiff has been totally disabled since March 4, 2002. Plaintiff is eligible to receive temporary total disability compensation beginning March 4, 2002 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
6. The Form 22 shows that Plaintiff's average weekly wage was $578.16, yielding a compensation rate of $385.45. N.C. Gen. Stat. § 97-2.
7. Defendants are entitled to a credit for short-term disability benefits paid to plaintiff during the period from March 5, 2002 through September 4, 2002, under the employer-funded plan. N.C. Gen. Stat. § 97-42.
8. Defendants are entitled to a credit for the unemployment insurance received by plaintiff for the period from September 5, 2002 through June 17, 2003. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendants shall pay all medical expenses incurred by plaintiff for reasonably necessary medical treatment that she has received as a result of the specific traumatic incident of January 29, 2002.
2. Subject to the credits owed, defendants shall pay plaintiff compensation at the rate of $385.45 per week as temporary total disability compensation beginning March 5, 2002 and continuing until she returns to work or until further order of the Commission. Such amounts as have accrued shall be paid in a lump sum, subject to the attorney's fee.
3. An attorney's fee of twenty-five percent of the compensation awarded to plaintiff herein is approved for Plaintiff's counsel. Twenty-five percent of the lump sum due shall be paid to plaintiff's counsel. Every fourth check of continuing disability payments shall be paid to plaintiff's counsel.
4. Defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER